IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. _____

MICHAEL SANCHEZ,

     Plaintiff,

v.

CITY AND COUNTY OF DENVER, ACTING BY AND THROUGH ITS BOARD OF
WATER COMMISSIONERS A/K/A/ DENVER WATER, and
TRAVELERS INDEMNITY COMPANY,

     Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff, Michael Sanchez, (hereinafter "Mr. Sanchez" or "Plaintiff") by and through his attorney, Jennifer Robinson, hereby files this Complaint and Jury Demand against City and County of Denver, Acting By and Through its Board of Water Commissioners a/k/a/ Denver Water, hereinafter ("Denver Water") and against Defendant Travelers Indemnity Company, (hereinafter "Travelers") and alleges as follows:

### I.    <u>NATURE OF THE CASE</u>

Denver Water has a systemic practice of reclassifying its employees' work related injuries from work related to non work related in order to force employees off its modified duty/light duty program that allows employees to work and continue being paid while recovering from work related injuries. Denver Water, through its agents and employees, actively uses strong-arm fear tactics to discourage injured workers from requesting an accommodation for their work restrictions by threatening them with job loss if Denver Water does not accommodate

1

the restriction. When the injured worker continues to seek treatment for the work related injury, the injury is reclassified from work related to non work related and the employee is forced to seek treatment from his or her own health care provider.  Prior to the reclassification, the injured worker is initially given an accommodation of a light duty assignment in Denver Water's warehouse.  However, after the reclassification Denver Water does an about-turn and retracts its modified duty/light duty accommodation and forces the still injured employee to exhaust any paid leave then take unpaid leave under the Family Medical Leave Act ("FMLA").

Ultimately, Denver Water places the still injured employee who has "not yet reached full improvement" into an unpaid leave status for months while the employee struggles (without pay) through the quagmire of fighting the employer and the workers' compensation insurance carrier through the workers' compensation system.   When Denver Water retracts its modified duty/light duty accommodation it fails to consider that the employee's work-related injury may also be a disability within the meaning of the Americans With Disabilities Act.  Denver Water's actions of not considering modified duty/light duty (or any other accommodation allowing the employee to continue working) and forcing employees to take unpaid leave are inconsistent with the ultimate purpose of the ADAAA, which is to allow the disabled employee to continue to be gainfully employed even where the employee "has not yet reached full improvement."

Travelers provides workers' compensation insurance to Denver Water's employees. Travelers has a systemic practice of reclassifying its insureds' work related injuries from work related to non work related in order to reduce its financial exposure for the payment of workers' compensation benefits. When Travelers reclassifies its insureds' work related injuries from work related to non work related, the insureds are forced to struggle through the quagmire of fighting

  
Denver Water's and Traveler's reclassification decision through the workers' compensation system for months (sometimes years) while receiving no pay.   In doing so, Travelers engages in deceitful practices such as ignoring its own records supporting the classification of the injury as work related and concealing supporting documentation that is inconsistent with its reclassification decision.   Travelers owes its insureds a duty of good faith and fair dealing in investigating and processing their claims and determining whether to deliver insurance benefits. Because of its superior bargaining position and unlimited resources, Travelers is able to "ride the system" to drag out the employee's claim in order to attempt to wear the employee (who now has little financial resources because of Denver Water's refusal to allow modified/light duty work) down.

Over the years, this system of addressing work place injuries has saved Denver Water and Travelers millions of dollars. Denver Water and Travelers employed these same tactics in reclassifying Mr. Sanchez's work-related injury and refusing to accommodate him, then eventually terminating his employment after he was injured on the job.   Denver Water's actions have led to a for cause determination by the Equal Employment Opportunity Commission. This lawsuit addresses Denver Water's and Travelers' actions against Mr. Sanchez in this regard as discussed more fully below.

## II.    JURISDICTION AND VENUE

1.    This is a Complaint for violations of the Americans with Disabilities Act of 1990, 42 U.S.C. §12101, *et. seq.,* as amended by the ADA Amendments Act of 2008 ("ADAAA"), the Rehabilitation Act of 1973, 29 U.S.C.§701, e*t. seq.* ("Rehab Act"), the Age Discrimination in Employment Act ("ADEA") and for breach of duty of good faith and fair dealing.   This Court

has subject matter jurisdiction over the claims asserted herein. Said claims are brought to recover damages and to secure other relief for the deprivation of Plaintiff's rights.

2.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1331 (Federal Question Jurisdiction), 42 U.S.C. §1334 (Civil Rights Jurisdiction) and 42 U.S.C. §1367 (Supplemental Jurisdiction).

3.      Venue is proper in this federal District Court pursuant to 28 U.S.C. § 1391(b)(2) because the employment practices or omissions alleged to be unlawful were committed within the City and County of Denver.

### III.    PARTIES

4.      Mr. Sanchez is a citizen of the United States and at all relevant times a Colorado citizen, domiciliary, and resident.  He is a former employee of Denver Water.

5.      At all relevant times Mr. Sanchez was an employee of Denver Water within the meaning of both federal law and Colorado statutes and laws.

6.      Denver Water is a municipal water utility physically located in Denver, Colorado and owned and operated by and through the City and County of Denver, a governmental entity and municipal corporation. Denver Water is subject to the personal jurisdiction of this Court.

7.      Upon information and belief, Denver Water accepts federal funds as that term is used and defined in the Rehabilitation Act.

8.      Upon information and belief, the City and County of Denver accepts federal funds as that term is used and defined in the Rehabilitation Act.

9.      Travelers is a foreign corporation doing business in Colorado.

10.     Travelers is subject to the personal jurisdiction of this Court.

## IV.  EXHAUSTION OF ADMINISTRATIVE REMEDIES

11.     All prerequisites or conditions precedent to the institution of this suit have been met.  On or about August 21, 2015 Plaintiff timely filed a charge of discrimination with the United States Equal Employment Opportunity Commission (EEOC) bearing charge #541-2015-02151.  The Charge was amended on or about January 30, 2017.

12.     On August 8, 2018 the EEOC issued its Determination finding reasonable cause to believe that Denver Water violated the ADAAA and failed to accommodate Mr. Sanchez stating:

> I have considered all the evidence obtained during the investigation and find that there is reasonable cause to believe that Respondent failed to accommodate Charging Party.  Respondent accommodated Charging Party by placing him on light duty under the workers' compensation policy.  However, once Respondent deemed that Charging Party's medical condition was not work injury related, Respondent stopped the light duty accommodation.  Shortly after, Charging Party engaged in a protected activity by requesting reasonable accommodation with a job transfer, but Respondent failed to engage in the interactive process by not considering a transfer to one of two vacant positions at the time, which Charging Party qualified for with light duty in lieu of protected leave while his medical condition improved.  Therefore, based on the evidence obtained during the investigation of this charge, I find there is reasonable cause to believe Respondent violated the statute, as alleged.

13.     On February 14, 2019 the EEOC issued Mr. Sanchez a Notice of Right to Sue in regard thereto.  This action was timely filed within ninety (90) days of Mr. Sanchez's receipt of said Notice of Right to Sue.

## V.  FACTUAL ALLEGATIONS

14.     Denver Water is a municipal water utility that serves the City and County of Denver and adjacent communities.

15.    Denver Water has its own occupational health care provider system that compels workers injured on the job to seek treatment from a treatment provider from within Denver Water's on-site health care provider system.

16.    Travelers provides insurance to Denver Water employees with workplace related injuries.

17.    In 2015 Mr. Sanchez was a long-term employee of Denver Water, having worked for it since January 1996.

18.    On March 25, 2015, in the course of his job duties as a Water Service Worker III, Mr. Sanchez was pulling a hydraulic drill from the side cabinet of the truck he was driving when he slipped and twisted and immediately experienced a sharp pain to his "**right low back**."

19.    As required by Denver Water, Mr. Sanchez went to Denver Water's on-site clinic to receive treatment for his work- related injury.

20.    At that time he also filed a workers' compensation claim and was seen by Denver Water's contracted health care provider, Doctor Hugh Macaulay.

21.    Mr. Sanchez reported to Dr. Macaulay and to Denver Water's on-site employees that he experienced an injury to and pain in his **lower back**.

22.    Travelers was responsible for investigating and processing Mr. Sanchez's claim.

23.    On March 25, 2015, the day of the injury, Travelers sent a letter to Annette Rossi ("Rossi") Commissioner of Denver Water Board, indicating that it had received notice of Mr. Sanchez's injury.

24.    Travelers instructed Rossi to "review this form to ensure the accuracy of the information provided."

25.    The form further described the incident leading to Mr. Sanchez's injury
confirming that Mr. Sanchez indicated, "I was pulling a hydraulic drill from the side cabinet of
my truck.  I pulled the lock pin then pulled the drill and twisted to my right to set it down.  As I
twisted I felt a sharp pain to **right low back**."

26.    Rossi never disputed the accuracy of Mr. Sanchez's statement that his injury was
to his **right low back**.

27.    Travelers noted that Denver Water has "a very proactive modified duty program
in place" and identified Mr. Sanchez's work status as "modified duty", no "lifting, twisting,
bending."

28.    Traveler's further noted that Denver Water did not dispute the validity of Mr.
Sanchez's claim stating, "Phone call to Jessica/employer at 303 628-6868 who advised that **no
question of validity** and will be on light duty at normal hours/same pay."

29.    Travelers' further identified the rationale for its decision as "Insured is not
questioning and IW [injured worker] was injured in the course and scope of employment by
lifting a large drill head and twisting, causing pain to his **lower back**."

30.    Traveler's notes consistently indicate that the part of the body that Mr. Sanchez
injured was to his "**lower back area** (include lumbar and lumbar-sacral)".

31.    Dawn Cogan, a Denver Water employee who acts in a dual role as a "Case
Manager" when coordinating the treatment of injured workers and "nurse" when injured workers
are being medically treated for their work related injury, further confirmed that Mr. Sanchez
reported that he felt pain in his **right lower back** and the part of the body injured was Mr.
Sanchez's "**low back area**."

7

32.     Mr. Sanchez was returned to work on March 25, 2015 after his injury.

33.     On March 26, 2015 Travelers' records indicate that Mr. Sanchez called in to Denver Water's clinic and indicated that he was in too much pain to talk and was going to spend the day trying to get back in to see the doctor.

34.     On March 27, 2015 Travelers' records continue to indicate that the part of the body Mr. Sanchez injured was to his "**low back area**."

35.     In addition to his **low back** diagnoses, Mr. Sanchez was further diagnosed with a dislocated rib, shortness of breath and "hitting" into his lung.

36.     On April 9, 2015 Travelers provided a General Admission of Liability admitting that Mr. Sanchez's injury of March 25, 2015 was work related and indicating that liability was limited to medical benefits only with no lost time or impairment rating.

37.     Travelers' classification of Mr. Sanchez's workplace injury as "medical only" with no impairment rating greatly reduced the costs that Travelers would have to pay out as a result of the injury.

38.     Mr. Sanchez continued to experience pain as a result of his work-related injury.

39.     On June 2, 2015 Mr. Sanchez saw Dr. Macaulay for a follow-up.

40.     Although Dr. Macaulay knew that restrictions should have been prescribed to prevent further injury to Mr. Sanchez's back, Dr. Macaulay failed to do so.

41.     Dr. Macaulay told Mr. Sanchez that if he were to give Mr. Sanchez restrictions, "he would need to have an impairment rating.  The restrictions may or may not be accommodated in which case he might or might not have a job."

42.     Dr. Macaulay's strong-arm tactics were meant to intimidate Mr. Sanchez and cause fear and distress that Denver Water might terminate Mr. Sanchez if he had restrictions.

43.     On June 3, 2015 Dr. Macaulay discharged Mr. Sanchez indicating that he was at Maximum Medical Improvement, there was no impairment and Mr. Sanchez could return to regular duty.

44.     At no time during Dr. Macaulay's early treatment did he indicate that Mr. Sanchez's injury to his lower back was not work related.

45.     After Dr. Macaulay discharged Mr. Sanchez with no restrictions Mr. Sanchez again attempted to return to work but doing so aggravated his injuries causing further pain and discomfort.

46.     During June 2015 Mr. Sanchez saw his primary care physician, Dr. Ryan Kramer. Mr. Sanchez indicated that his back pain returned within 2-3 days of working and that the pain was mostly in his **right lower back**.  In spite of treatment, the pain persisted.

47.     On June 23, 2015 Travelers' records indicate that Travelers had reclassified Mr. Sanchez's initial injury from an injury to his **lower back** to an injury to his **mid-back**, stating, "Claim accepted for lumbar sprain sustained when EE, Water Service Worker III, was at jobsite looking for a leak (as detection system was alerted).  When attempting to grab a 50-lb hydraulic drill from side panel, EE turned and experienced very sharp/sudden pain in right side of his **mid back**."

48.     After reclassifying Mr. Sanchez's initial injury from an injury to his **lower back** to an injury to his **mid back** Travelers denied that Mr. Sanchez's existing injuries were work related, later claiming that the **lower back** injuries did not occur on March 25, 2015.

49.    As of June 23, 2015 Travelers was aware that Mr. Sanchez continued "to suffer from severe pain and has missed time from work as a result of his injuries."

50.    In spite of Travelers' knowledge that its newly stated position that Mr. Sanchez's initial injury was to his **mid back** was false, Travelers acted in bad faith in refusing to correct the false assertion and instead forcing Mr. Sanchez to file an objection and seek an independent medical examination pursuant to the workers' compensation statute.

51.    However, when Travelers sent Mr. Sanchez's medical records to the doctor performing the independent medical examination, Travelers omitted those portions of Mr. Sanchez's medical file that did not support its theory that Mr. Sanchez's **lower back** injury was not work related.

52.    On July 4, 2015 Mr. Sanchez attempted to return to work again but his back gave out and he sought treatment on July 6, 2015.

53.    During his July 6, 2015 exam, Mr. Sanchez was distraught with the fear of never working again.  Signs of depression worsened.

54.    Mr. Sanchez sought a second opinion.

55.    On July 9, 2015 Dr. David Yamamoto filled out a Physician's Report of Worker's Compensation Injury indicating that Mr. Sanchez's injury was work related and diagnosing Mr. Sanchez with a lumbar and thoracic strain.  Dr. Yamamoto indicated that Mr. Sanchez was working sporadically but he needed further evaluation and treatment.

56.    On July 14, 2015 Traveler's provided a Final Admission of Liability purportedly to confirm that Mr. Sanchez's injury was work related and indicating that Mr. Sanchez was

placed at MMI with no impairment on June 3, 2015 based on Dr. Macaulay's medical report of June 3, 2015.

57.    By doing so, Travelers relied on the reclassification of Mr. Sanchez's initial injury from an injury to his **lower back** to an injury to his **mid back**.

58.    Mr. Sanchez disagreed with Dr. Macaulay's medical report that stated that he was at maximum medical improvement as of June 3, 2015.

59.    On or about July 21, 2015 Dr. Macaulay referred Mr. Sanchez to Robert Kawasaki for a consultation.    However, neither Travelers nor Dr. Macaulay provided   Dr. Kawasaki with Mr. Sanchez's full medical records, which established that Mr. Sanchez's injury was to his **lower back**.

60.    This omission led to an inaccurate assessment of Mr. Sanchez's injury resulting in the reclassification of his injury from work related to non work related to save on workers' compensation related costs.

61.    When Dr. Kawasaki was later provided with Mr. Sanchez's complete medical file, he revised his opinion and confirmed that Mr. Sanchez's injury was to his lower back.

62.    At all times relevant hereto Travelers had the power, motive, and opportunity to act unscrupulously in its dealing with Mr. Sanchez.

63.    Because Dr. Macaulay had instructed Mr. Sanchez to return to work after his injury, Mr. Sanchez attempted to report back to work in his regularly assigned position.

64.    However, in doing so his back injury was aggravated after working for 2 or 3 days.  Mr. Sanchez would take off work after his injury was aggravated then return to light duty followed by a return to his regular position then further aggravation of the injury.

65.    Prior to August 5, 2015 Denver Water accommodated Mr. Sanchez by allowing him to work light duty under its modified/light duty work program.

66.    This cycle continued from the time Mr. Sanchez was injured until August 5, 2015.

67.    At that time Denver Water received an assessment from Mr. Sanchez's treating physician, Dr. Yamamoto, indicating that that Mr. Sanchez's injury **was** work related.

68.    In response, Jessica Bedwell ("Bedwell") an on-site nurse for Denver Water informed Mr. Sanchez that low back treatment would not be authorized through workers' compensation. Bedwell advised Mr. Sanchez to follow up with his primary care physician.

69.    Bedwell did not have the authority to dictate Mr. Sanchez's treatment.

70.    Mr. Sanchez was also informed that he could no longer participate in Denver Water's light duty/modified duty work program.

71.    On or about August 7, 2015 Mr. Sanchez sent his work supervisor, Joe Duran ("Duran"), a message inquiring about light duty and asking whether he could be accommodated anywhere in water control.

72.    Duran responded informing Mr. Sanchez that he did not have any restrictions and "since there are no restrictions there is nothing to accommodate."

73.    Duran also told Mr. Sanchez that he could submit an official request for vacation leave and if he was absent from work for a medical condition he should be speaking with Deb Engleman from Human Resources regarding the applicability of FMLA.

74.    Prior to informing Mr. Sanchez that he had to go on FMLA neither Duran nor anyone else at Denver Water engaged in the interactive process to find out about other possible accommodations.

75.     On August 10, 2015 Mr. Sanchez saw Dr. Yamamoto for a follow-up appointment.  At that time Dr. Yamamoto indicated that Mr. Sanchez had temporary restrictions and that Mr. Sanchez was able to return to modified duty work.

76.     On August 10, 2015 Engleman sent Mr. Sanchez an FMLA Certification of Healthcare Provider form stating that the form had to be filled out in order for Denver Water to give Mr. Sanchez protection under the FMLA.

77.     Mr. Sanchez again asked for an accommodation of light duty.

78.     On August 11, 2015 Dr. Macaulay informed Mr. Sanchez that his injury was not work related and told him to report back to work.

79.     After Mr. Sanchez hired an attorney regarding the denial of his worker's compensation claim, Denver Water told Mr. Sanchez to review his time records to identify the days he took off from the date of his injury through August 11, 2015.

80.     Denver then back-dated Mr. Sanchez's FMLA leave to March 25, 2015.

81.     From August 5, 2015 through March 2016 Denver Water and Travelers continued to receive medical documentation indicating that Mr. Sanchez's injury was work related and Mr. Sanchez could return to work with temporary restrictions.

82.     Denver Water continued in its refusal to engage in the interactive process and would not consider allowing Mr. Sanchez an accommodation of a light duty/modified duty work assignment.  Nor would Denver Water transfer Mr. Sanchez to a position he could perform with an accommodation.

83.     On November 12, 2015 Mr. Sanchez was evaluated by Dr. Sander Orent for and Independent Medical Evaluation.

84.    Dr. Orent raised serious concerns about Dr. Macaulay's findings and treatment, or lack thereof, raising the possibility that Dr. Macaulay had an inappropriate conflict of interest in treating Mr. Sanchez.  Dr. Orent further opined that Mr. Sanchez suffered an injury to his **lower back** that was not a thoracic strain as opined by Dr. Macaulay and Mr. Sanchez's treatment was incomplete.  At that time, Dr. Orent further opined that Mr. Sanchez was not at MMI for his work injury.

85.    Both Denver Water and Travelers ignored Dr. Orent's report.

86.    On December 7, 2015 Dr. Robert Kawasaki reviewed Mr. Sanchez's medical records and opined that there was a "medical probable indication of an initial injury to Mr. Sanchez's **lower back** with the thoracic spine and ribs.  Injury to the low back has been clearly documented in the initial intake and reporting of the injury."

87.    Both Denver Water and Travelers ignored Dr. Kawasaki's report.

88.    Both Denver Water and Travelers continued to classify Mr. Sanchez's injury to his lower back as non work related.

89.    Denver Water's only response was to allow Mr. Sanchez to apply for "job protection" which would only keep his job open during his recovery thereby denying him the opportunity to return to work (and pay status) on a modified/light duty schedule before he reached "full improvement".

90.    On or about January 13, 2016 and March 14, 2016 Mr. Sanchez again asked Denver Water to accommodate his disability by letting them know that he was willing to do any light duty.

91.     On March 16, 2016 Denver Water sent Mr. Sanchez a letter indicating that it had scheduled a Disability Review Conference.

92.     The Disability Review Conference is required when Denver Water plans on terminating a disabled employee.

93.     During the conference Denver Water indicated that, due to his restrictions, Mr. Sanchez could not be accommodated.

94.     Denver Water continued to refuse to consider light duty or modified duty work that employees with work related injuries were routinely provided when they needed an accommodation.

95.     Mr. Sanchez was qualified to participate in Denver Water's light duty/modified duty work program.

96.     It was not an undue hardship for Denver Water to allow Mr. Sanchez to work a light duty/modified duty position.

97.     In spite of Denver Water's assertions that a leave of absence was a reasonable accommodation and "especially appropriate for a disabled employee who is still recovering from a medical condition, and has not yet reached full improvement" Denver Water terminated Mr. Sanchez's employment effective March 31, 2016.

98.     After his termination Mr. Sanchez would spend the next three years muddling through the quagmire of the workers' compensation system with no income and no health insurance attempting to receive medical treatment and coverage for his work related injury.

99.     In March 2018 Travelers approved a one-time medical evaluation of Mr. Sanchez's injury by Dr. Stephen Danahey.

100.    Prior to the evaluation Travelers provided false information to Dr. Danahey to influence him in providing the evaluation.

101.    For example, Travelers reported to Dr. Danahey that, "Mr. Sanchez has very recently indicated he is in need of additional medical treatment for this Workers' Compensation claim."

102.    However, Travelers knew that Mr. Sanchez had continuously been seeking treatment for his injury since the injury occurred on March 25, 2015, nearly three years earlier.

103.    Travelers also falsely reported to Dr. Danahey that Mr. Sanchez had "recently underwent surgery to his lumbar spine" when Travelers knew that Mr. Sanchez had not undergone any surgery at all.

104.    Travelers further falsely reported to Dr. Danahey that Mr. Sanchez had retired when Travelers was aware that Mr. Sanchez had been terminated after Denver Water refused to accommodate him after his work related injury.

105.    Travelers did not disclose to Dr. Danahey that there were multiple evaluations that disagreed with Dr. Macaulay's assessment of Mr. Sanchez's injury.

106.    Finally, Travelers falsely reported to Dr. Danahey that Mr. Sanchez's current complaints of worsening pain was in his mid-back area.

107.    Travelers was aware that Mr. Sanchez's complaints were related to pain in his lower back area.

108.    Travelers acted in bad faith in falsely reporting Mr. Sanchez's injuries and omitting medical information critical to properly evaluating Mr. Sanchez's injury.

109.    On or about July 2018 Travelers learned that the latest independent medical examination concluded that Mr. Sanchez had not reached maximum medical improvement on June 3, 2015 as initially indicated and that Mr. Sanchez had an impairment rating of 7%.

110.    Travelers continued to refuse to pay or settle Mr. Sanchez's claim.

111.    A reasonable insurer under these circumstances would have paid or otherwise settled Mr. Sanchez's claim.

112.    Travelers owed Mr. Sanchez a duty of good faith and fair dealing in investigating and processing his claim and determining whether to deliver insurance benefits.

113.    Travelers had a significant financial incentive to delay or deny payment of benefits or coerce its insured into diminished settlement.

## VI.    CLAIMS FOR RELIEF

**FIRST, SECOND AND THIRD CLAIMS FOR RELIEF:
DISCRIMINATION, FAILURE TO ACCOMMODATE AND
RETALIATION UNDER THE ADAAA AND REHABILITATION ACT**
**(Against Denver Water)**

114.    Plaintiff incorporates by reference all preceding paragraphs as though fully set forth.

115.    At all times relevant, Plaintiff was a qualified individual with a disability and was qualified for his position as demonstrated by his long-term and successful performance with Denver Water.

116.    As described more fully above, Plaintiff was initially injured severely on March 25, 2015 when he suffered a spinal injury to his lower back.

117.    Plaintiff's back injury is a disability as defined by the ADAAA.

17

118.    Plaintiff's spine related disability not only significantly impaired his employability, but also major life activities such is lifting, bending, working, climbing, squatting, including ambulation/mobility and ability to sleep.

119.    After his injury, Plaintiff was released to return to light duty work.

120.    However, when Plaintiff's injury was classified from work related to non-work related Denver Water withdrew its light duty accommodation and refused to accommodate Plaintiff by placing him on light duty or transferring him to a vacant position for which he was qualified with a light duty accommodation.

121.    Denver Water could have accommodated Plaintiff's disability without undue hardship and without any significant disruption in the availability of its light duty program for injured workers.

122.    Denver Water discriminated against Plaintiff by terminating his employment because he was disabled, by refusing to accommodate him, and by failing and refusing to engage in any interactive process when it removed the light duty accommodation.

123.    Denver Water retaliated against Mr. Sanchez after he engaged in protected activity multiple times after his injury as discussed above.

124.    Denver Water took adverse actions against Mr. Sanchez including refusing to allow him light duty work, refusing to place him in an open position for which he was qualified with an accommodation, forcing him to exhaust his FMLA leave and terminating his employment.

125.    Denver Water's actions were in violation of the Americans with Disabilities Act, 42 U.S.C.§§12101, *et. seq.,* as amended by the ADAAA and the Rehabilitation Act.

126.    Denver Water's discriminatory actions did cause and will continue to cause Mr. Sanchez to suffer economic losses as well as emotional distress and other significant injuries, damages, and losses.

127.    As a direct and proximate result of the acts and omissions described herein, Plaintiff has suffered and incurred, or may be reasonably expected to suffer or incur, the following damages and other losses, including but not limited to: lost income or employment compensation and fringe benefits, thereby justifying appropriate awards of front pay and back pay; damage to reputation and character, emotional or mental anguish, distress, upset, humiliation, embarrassment, or degradation, pain and suffering; and other consequential, incidental,  or related damages to Plaintiff's employment rights, privileges, interests, as well as statutory interest, and reasonable attorney's fees and costs incurred in connection herewith.

### FOURTH CLAIM FOR RELIEF – AGE DISCRIMINATION
### (Against Denver Water)

128.    Plaintiff incorporates by this reference all preceding paragraphs as though fully set forth herein.

129.    Mr. Sanchez's date of birth is March 7, 1965 and, as such, he is a member of a class of citizens protected by the Age Discrimination in Employment Act.

130.    At all relevant times, Mr. Sanchez performed his job functions competently and was qualified for his position with Denver Water.

131.    Injured workers with work restrictions who were younger than Mr. Sanchez were accommodated and allowed to continue working under Denver Water's light duty/modified duty program while Mr. Sanchez was told that he could not work with his restrictions and had to take FMLA in spite of the fact that Mr. Sanchez could have continued working with a light duty

accommodation.

132.   Denver Water employees Ryan Deherrera and Juan Carrillo were both in their 20s and had restrictions that were accommodated with light duty.

133.   Duran approved the accommodations for these two individuals.

134.   Duran refused to accommodate Mr. Sanchez with light duty.

135.   Denver Water's actions eventually led to Mr. Sanchez's termination.

136.   Denver Water, by and through the conduct of its employees and agents, has unlawfully denied Mr. Sanchez the benefits, privileges, promotional opportunities, and terms and conditions of employment due to his age.

137.   As discussed above, Mr. Sanchez was subjected to adverse treatment based on his age.

138.   The effect of the practices complained of above has been to deprive Mr. Sanchez of equal employment opportunities and otherwise adversely affect his status as an employee.

139.   The unlawful employment practices complained of above were intentional.

140.   The unlawful employment practices complained of above were done with malice or reckless indifference to Mr. Sanchez's federally protected rights.

141.   Denver Water's discriminatory actions did cause and will continue to cause Mr. Sanchez to suffer economic losses as well as emotional distress and other significant injuries, damages and losses.

142.   As a direct and proximate result of the acts and omissions described herein, Plaintiff has suffered and incurred, or may be reasonably expected to suffer or incur, the following damages and other losses, including but not limited to: lost income or employment

compensation and fringe benefits, thereby justifying appropriate awards of front pay and back pay; damage to reputation and character, emotional or mental anguish, distress, upset, humiliation, embarrassment, or degradation, pain and suffering; and other consequential, incidental,  or related damages to Plaintiff's employment rights, privileges, interests, as well as statutory interest, and reasonable attorney's fees and costs incurred in connection herewith.

**FIFTH CLAIM FOR RELIEF**
**BAD FAITH BREACH OF INSURANCE CONTRACT**
**(Against Travelers)**

143.    Plaintiff incorporates by this reference all preceding paragraphs as though fully set forth herein.

144.    At all times relevant hereto, Travelers provided workers' compensation insurance to Denver Water employees.

145.    The core purpose of the workers' compensation insurance is to shield the employee from potentially catastrophic losses in the event that the employee is unable to work due to a work-related injury.

146.    As such, Travelers has a special relationship with Denver Water employees, including Mr. Sanchez, arising out of the unique nature and purpose of the insurance contract as well as the statutory and regulatory provisions of the Workers' Compensation Act.

147.    There is an enormous disparity of bargaining power between insurers like Travelers and its insureds like Mr. Sanchez such that Travelers has a financial incentive to use its leverage and the disparity of bargaining power to limit recovery on employee claims at the expense of its insureds.

148.    Travelers owes Mr. Sanchez a duty of good faith and fair dealing in the

processing, investigation, payment and settlement of his claim.

149.    As discussed more fully above, Travelers breached the duty of good faith and fair dealing owed to Mr. Sanchez by improperly and unlawfully reclassifying Mr. Sanchez's injury from work-related to non work related, failing to properly investigate threats by Denver Water's agents of job loss if Mr. Sanchez was given any restriction, failing to provide complete medical records to treatment providers evaluating Mr. Sanchez's injury, concealing records that support Mr. Sanchez's injury as work related, falsely claiming that Mr. Sanchez had retired and had received surgery for his injury, refusing to compensate Mr. Sanchez for his impairment rating, and other acts designed to withhold/delay/deny benefits and/or to unlawfully circumvent Colorado's regulatory and statutory workers' compensation procedures.

150.    Travelers' conduct in the processing, investigation and payment or settlement of Mr. Sanchez's claim was unreasonable.

151.    Travelers knew that its conduct was unreasonable or acted with reckless disregard of whether its conduct was unreasonable.

152.    As a direct and proximate result of Travelers' failure to act in good faith Mr. Sanchez has suffered and continues to suffer actual and consequential damages in amounts to be proven at trial.

153.    Mr. Sanchez's damages are not limited to the amount recoverable on his workers' compensation claim but in a tort claim against an insurer for breach of the duty of good faith and fair dealing, the plaintiff may recover damages for emotional distress without proving substantial property or economic loss.

154.    Compensatory damages for economic and non-economic losses are available to

make Mr. Sanchez whole and punitive damages are available to punish Travelers and deter wrongful conduct by other insurers.  Such non-economic losses include, but are not limited to, emotional distress; pain and suffering, inconvenience; fear and anxiety and impairment of the quality of life.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor:

(a)    Awarding back and front pay, as appropriate;

(b)    Awarding lost employment benefits, health and retirement or pension benefits, and other compensation lost to him as a result of his unlawful termination;

(c)    Liquidated damages doubling the award of interest, wages, lost employment and retirement benefits, and other compensation lost to him as a result of Defendants' discriminating against him on the basis of his age;

(d)    Reinstatement to his position or in the alternative, pay for his job beginning on the date he was forced to take leave and extending for a reasonable period into the future;

(e)    Awarding compensatory and consequential damages, as allowed;

(f)    Awarding punitive damages as allowed by law.

(g)    Awarding injunctive, declaratory, and other remedial relief;

(h)    Awarding the costs of this action, together with reasonable attorney's fees, and expert witness fees;

(i)    Awarding prejudgment and post judgment interest, as provided for by law, tax off-set; and

(j)    Granting such other or further relief as the Court deems necessary or appropriate.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE**

This 6th day of May, 2019.

Respectfully submitted,


*/s/* Jennifer Robinson #24764
7900 E. Union Ave, Suite 1100
Denver, Colorado 80237
Tel: (303) 872-3063
jrobinson@raemployment.com

Attorney for Plaintiff


A copy of this Complaint has been provided to Plaintiff.